DENBURY ONSHORE, LLC, a
Delaware Limited Liability Company,

    Plaintiff,

v.

ROBERT F. CHRISTENSEN and
JANET K. CHRISTENSEN,

    Defendants.

2015 APR 17 AM 7 54

STEPHAN HARRIS, CLERK
CHEYENNE

Case No. 14-CV-19-ABJ

---

**OPINION AND ORDER DENYING DENBURY'S MOTION FOR SUMMARY
JUDGMENT ON ITS THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF
AGAINST THE CHRISTENSEN DEFENDANTS
AND
OPINION AND ORDER DENYING DENBURY'S MOTION FOR SUMMARY
JUDGMENT ON CHRISTENSENS' COUNTERCLAIM IV (BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING) AND THEIR DAMAGES
COUNTERCLAIMS
AND
ORDER GRANTING IN PART AND DENYING IN PART DENBURY'S MOTION TO
STRIKE AFFIDAVIT AND EXHIBITS**

---

The following have come before the Court for consideration: Denbury Onshore, LLC's,

Plaintiff, *Motion for Summary Judgment on its Third, Fourth, and Fifth Claims for Relief

Against the Christensen Defendants* (Doc. No. 17), Robert F. Christensen's and Janet K.

Christensen's ("Christensens"), Defendants, opposition (Doc. No. 24), and Denbury's further

reply (Doc. No. 25); Denbury's *Motion for Summary Judgment on Christensens' Counterclaim

IV (Breach of the Covenant of Good Faith and Fair Dealing) and Their Damages Counterclaims*

(Doc. No. 51), and the Christensens' opposition (Doc. No. 62); and Denbury's *Motion to Strike

Affidavit and Exhibits* (Doc. No. 65), and the Christensens' opposition (Doc. No. 75). After

reviewing the parties' submissions, the arguments of counsel at the hearing, the applicable law, and being fully advised, the Court finds that Denbury's *Motion for Summary Judgment on its Third, Fourth, and Fifth Claims for Relief Against the Christensen Defendants* should be **DENIED**, that Denbury's *Motion for Summary Judgment on Christensens' Counterclaim VI (Breach of the Covenant of Good Faith and Fair Dealing) and Their Damages Counterclaims* should be **DENIED**, and that Denbury's *Motion to Strike Affidavit and Exhibits* should be **GRANTED IN PART and DENIED IN PART** for the reasons stated below.

## BACKGROUND

This case centers on the proposed construction of a one-quarter mile long road in Section 3, Township 45 North, Range 76 West, Campbell County, Wyoming.[1]  The United States conveyed the surface of Section 3 by patents issued pursuant to the Stock-Raising Homestead Act of 1916, 43 U.S.C. §§ 291–302 ("SRHA").  Under the patents, the United States reserved all minerals underlying Section 3 as well as the right to use the surface of Section 3 to produce the reserved minerals.  Robert Christensen's parents, Charles and Alice Christensen ("Christensen Parents"), owned a ranch in Campbell County, Wyoming, which included the surface of Section 3.  Between 1976 and 1988, Robert and Janet Christensen obtained their interest in the lands from Christensen Parents via four different warranty deeds.

---

[1] Denbury's first and second claims for relief relate to operations on Section 14, Township 45 North, Range 76 West, Campbell County, Wyoming.  Doc. No. 1.  However, at the time Denbury filed motions for summary judgment, Denbury had gained access to Section 14.  Doc. No. 18.  As a result, "Denbury has not asked the Court for immediate relief on its Claims One and Two against the Defendants." *Id.*

2

On August 22, 1980, the Wyoming Oil and Gas Conservation Commission ("WOGCC") created the Hartzog Draw Unit ("HDU"), a 35,000 acre oil and gas secondary recovery unit in Campbell and Johnson Counties, Wyoming, which includes Section 3. The surface of the HDU overlies federal, state, and private mineral interests. All minerals under the unit surface have been committed to the HDU. All mineral interests included in the HDU share in the production of oil and gas from unit operations, irrespective of the location of the wells from which oil and gas is produced.

The federal government certified the Unit on August 27, 1980 and determined that "the drilling, production, rental, minimum royalty, and royalty requirement of all Federal leases committed to [the Unit] agreement are hereby established, altered, changed, or revoked to conform with the terms and conditions of this agreement." The State of Wyoming Board of Land Commissioners approved the Unit Agreement and included State of Wyoming minerals in the Unit in its July 17, 1980 Order and also amended the State of Wyoming leases to conform to the Unit Agreement. In pertinent part, the Unit Agreement states the following:

> WHEREAS, the parties hereto are the owners of working, royalty, or other oil and gas interests in the Unit Area subject to this Agreement; and

> WHEREAS, the term "Working Interest" as used herein shall mean the interest held in Unitized Substances or in lands containing Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, which is chargeable with and obligated to pay or bear all or a portion of the costs of drilling, developing, producing, and operating the land under the unit or cooperative agreement. "Royalty Interest" as used herein shall mean a right to or interest in any portion of the Unitized Substances or proceeds thereof other than a Working Interest. The owner of oil and gas rights that are free of lease or other instrument conveying the working interest rights to another shall be regarded as a Working Interest Owner to the extent of a seven-eighths (7/8ths) interest in and to such oil and gas rights, and as a Royalty Owner to the extent of the remaining one-eight (1/8th) interest therein;

> * * *

3

NOW THEREFORE, in consideration of the premises and the promises herein contained, the parties hereto commit to this Agreement their respective interests in the below-defined Unit Area . . . .

* * *

1. ENABLING ACT AND REGULATIONS. The Mineral Leasing Act of [illegible], as amended, supra, and all valid, pertinent regulations, including operating and unit plan regulations, heretofore issued thereunder or valid, pertinent and reasonable regulations hereafter issued thereunder are accepted and made a part of this Agreement as to Federal lands, provided such regulations are not inconsistent with the terms of this Agreement; and as to non-Federal lands, the oil and gas operating regulations in effect as of the effective date hereof governing drilling and producing operations, not inconsistent with the terms hereof or the laws of the State in which the non-Federal land is located, are hereby accepted and made a part of this Agreement.

* * *

10. RIGHTS AND OBLIGATIONS OF UNIT OPERATOR. Except as otherwise specifically provided herein, the exclusive right, privilege, and duty of exercising any and all rights of the parties hereto, including surface rights, which are necessary or convenient for prospecting for, producing, storing, allocating, and distributing the Unitized Substances are hereby delegated to and shall be exercised by the Unit Operator as herein provided. Acceptable evidence of title to said rights shall be deposited with said Unit Operator and, together with this Agreement, shall constitute and define the rights, privileges, and obligations of Unit Operator. Nothing herein, however, shall be construed to transfer title to any land or to any lease or operating agreement, it being understood that under this Agreement the Unit Operator, in its capacity as Unit Operator, shall exercise the rights of possession and use vested in the parties hereto only for the purposes herein specified.

* * *

11. PLAN OF OPERATION. . . . [T]he parties hereto, to the extent of their rights and interests, hereby grant to the Unit Operator the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for the operation and the development of the Unit Area hereunder.

* * *

26. NO WAVIER OF CERTAIN RIGHTS. Nothing in this Agreement contained shall be construed as a waiver by any party hereto of the right to assert any legal or constitutional right or defense as to the validity or invalidity of any law of the State of Wyoming, or of the United States, or regulations issued

> thereunder in any way affecting such party, or as a waiver by any such party of
> any right beyond his or its authority to waive . . . .

Doc. No. 18-1, p. 4–39. On July 16, 1980, Cities Service, Denbury's predecessor in interest, the

Christensen Parents, and the Christensens approved and became parties to the Unit Agreement.

The Christensen Parents and the Christensens became parties to the Unit Agreement by singing

an "Agreement to become a party to Unit Agreement or Unit Operating Agreement Hartzog

Draw Unit Area Campbell and Johnson Counties, Wyoming." *Id.* at 40–45. The Christensen

Parents and the Christensens signed that agreement as "Royalty Owners." *Id.*

On September 1, 1983, Cities Service and the Christensen Parents entered into the

Surface Damage Agreement ("SDA"). In pertinent part, the SDA provides the following:

> For and in consideration of the covenants and agreements herein contained, and
> other valuable consideration, the parties hereto AGREE:
>
> 1.     That operator conducts oil and gas production operations on Owner's
> property situated in Campbell & Johnson Counties State of Wyoming, to
> Wit: . . . [Section] 3 . . . in T45N, R76W.
>
> * * *
>
> 3.     That in order for Operator to enter and conduct production operations, it is
> necessary that they cross and use certain property of Owners, and the parties
> hereby agree as to the entry and surface use thereof.
>
> 4.     Owners hereby give, grant and convey unto Operator, its agents,
> employees and assigns, a right-of-way easement to enter upon and use the
> property of Owners for the purpose of conducting production operations of the
> below described wells and facilities under lease or leases.
>
> * * *
>
> 7.     It is agreed that this Agreement can be amended so as to add rights-of-
> way, easements, and site payments by the revision of Exhibit "A" and Exhibit "B"
> to the mutual satisfaction of Owners and Operator.
>
> 8.     Operator shall notify Owners prior to entry upon said lands. Operator will
> advise Owners as to the location of well site and shall consult with Owners as to
> the location of roads, pipelines and other facilities. All surface and mineral use

not inconsistent with the rights of Operator, including the right to grant successive easements thereon or across, are hereby reserved to Owner and consideration shall always be given to such reserved uses and rights when locating sites, roads, pipelines and facilities. Owners agree that any successive easements granted by Owners on or across site locations, roads and pipelines established by Operator, shall be made subject to Operator's rights under this agreement.

\* \* \*

19.     Exhibits "A" and "B" attached hereto describing said roads, well sites, and battery sites are made a part of this Agreement. Exhibits "A" and "B" may be amended by adding to or deleting roads or sites covered under their Agreement by written approval of both the Owners and Operator. Such amendments to Exhibits "A" and "B" shall be a part of this agreement in all respects.

Doc. No. 18-1, p. 51–58.

In 2002, the Unit Operator drilled and completed four more wells located within the Christensens' ranch and the HDU. The Christensens entered into a separate surface damages agreement in which they accepted a onetime payment of $21,946.59 for damages related to drilling and completion of those wells. In a subsequent agreement dated October 31, 2003, the Christensens were paid an additional $5,000.00 in surface damages. No amendment to the SDA accompanied those agreements. The Christensens later entered into an agreement with the Unit Operator dated January 10, 2006 for surface damages for use of a portion of their ranch on which coal bed methane operations were conducted within the HDU.

Denbury is the current Unit Operator of the HDU. On November 27, 2013, Denbury notified the Christensens that it intended to construct approximately 1,500 feet of new road ("New Road") in Section 3 to connect two existing roads within the HDU. The site of the New Road overlies federally reserved mineral interests. Denbury offered to amend the SDA and pay the Christensens $1,691.26 for surface damage associated with construction the New Road. Denbury calculated this amount to be four times the value of the land to be disturbed. The

Christensens rejected Denbury's offer and requested an initial payment of $2,500.00 per acre and annual payments of $3,000.00 for Denbury's construction and use of the New Road.

Denbury did not agree to the amount proposed by the Christensens. Instead, Denbury notified the Christensens by letter dated January 8, 2014 that it intended to begin constructing the New Road on January 14, 2014. When Denbury began constructing the New Road on January 14, 2014, Robert Christensen ordered Denbury off of Section 3. Mr. Christensen stated that Denbury could not come onto Section 3 to continue constructing the New Road until a judge ordered him to do so.

On July 11, 2014 and September 4, 2014, Mathew Dahan, Denbury's Vice President of the North Region, met with Mr. Christensen to discuss damage payments for the New Road. Denbury offered four times 110% of what it assessed to be the fair market value of the land that would be disturbed by the New Road. The Christensens rejected Denbury's offer.

Denbury notified the BLM on June 18, 2014 of its intent to build the New Road. The BLM approved Denbury's notice on August 14, 2014. Denbury also gave notice to the WOGCC on July 16, 2014. Denbury obtained approval to post a $5,000 bond as surety for any damages to the Christensens' land and posted the bond, which the WOGCC accepted.

On January 29, 2014, Denbury filed the *Complaint* in this action. Denbury alleged that this Court has jurisdiction under both 28 U.S.C. §§ 1331 and 1332. Denbury asserted that "this Court has jurisdiction over this case because it involves a federal question as to the right of Denbury to access Christensen Ranch surface overlying Federal Minerals." Doc. No. 1. Denbury further asserted that "this Court has jurisdiction because there is complete diversity between Denbury and the Christensens and the costs and expenses Denbury will suffer due to the Christensens' refusal to allow Denbury access to surface they own exceeds the sum of

7

"$75,000.00." *Id.* In the *Complaint*, Denbury made the following claims for relief: (1) "Injunction for use of the Surface to conduct operations for the HDU-5144H Well"; (2) "Damages resulting from Defendants' denying Denbury use of the Surface to conduct operations for the HDU 5144H Well"; (3) "Injunction for use of the Section 3 Surface to complete the Road Work"; (4) "Declaratory Judgment that Denbury is entitled to use all contiguous Defendant surface overlying federal minerals"; and (5) "Declaratory Judgment that Denbury is entitled to use all Defendant surface overlying the minerals in the Unit Area." Doc. No. 1. On March 10, 2014, the Christensens answered and asserted the following counterclaims: (1) Declaratory relief—Denbury failed to negotiate in good faith; (2) Declaratory relief—Denbury's road is not reasonably necessary to development of the underlying lease; and (3) Trespass.

On March 9, 2014, Denbury filed a *Motion for Summary Judgment on its Third, Fourth and Fifth Claims for Relief Against the Christensen Defendants* and an accompanying memorandum brief. Docs. No. 17, 18. Denbury requested the Court grant summary judgment on three of its claims: (1) "Declare that Denbury is entitled to use all contiguous surface of the Christensen [Ranch] that overlies Federal minerals in the Unit"; (2) "Declare that Denbury is entitled to use all surface of the Christensen [Ranch] located within the Unit, no matter who owns the minerals underlying the Christensen [Ranch];" (3) "Rule that Denbury is entitled to immediate access to construct and use the New Road in Section 3 and enjoin the Christensens from interfering with Denbury's construction and use of the New Road." Doc. No. 18. Denbury did not seek summary judgment on its First and Second Claims for Relief because "shortly after Denbury filed this action, it gained access to Section 14 to commence operations and the HDU 5144H well was spudded on April 16, 2014, completed on June 17, 2014 and is producing hydrocarbons in the Unit." *Id.*

8

With regard to its Fourth and Fifth Claims for Relief, Denbury argues the effect of the Unit Agreement, the Wyoming Split Estate Act, BLM orders, and state orders is to treat the entire Unit as a single oil and gas lease; and therefore, Denbury is entitled to reasonable use of the Christensen's surface land overlying Unit minerals for the development of those minerals. Denbury points to the Tenth Circuit's recent decision in *Entek GRB v. Stull Ranches* that stated "the designated [unit operator] can enter and occupy the surface above any leasehold in the unitized area to the extent that surface access is reasonably incident to mining in any leasehold in the unitized area." 763 F.3d 1252, 1256 (10th Cir. 2014). Thus Denbury argues it is entitled to reasonable use of the entire Christensen Ranch located within the Unit area for Unit operations. With regard to its third claim for relief, Denbury argues that the requirements for a permanent injunction are satisfied.

On October 30, 2014, the Christensens filed their response to Denbury's motion. Doc. No. 26. The Christensens argue that the Unit Agreement and the SDA dictate Denbury's use of the surface within the HDU; and thus, *Entek* does not apply. The Christensens point out that the Unit Agreement limits use of the surface to those "uses reasonably necessary for the operation and the development of the Unit." Doc. No. 24. To grant a declaration that Denbury can use the entire surface of the Christensen Ranch within the Unit Area, the Christensens argue, would circumvent the Unit Agreement. The Christensens also dispute whether the New Road is reasonably necessary for the operation and development of the Unit. Finally, the Christensens contend that the SDA contains an implied covenant of good faith and fair dealing, which Denbury breached. In response to Denbury's arguments regarding its Third Claim for Relief, the Christensens argue that Denbury has not presented evidence that it is suffering irreparable harm or that the harm it suffers cannot be remedied at law.

On November 6, 2014, Denbury filed a reply brief. Doc. No. 25. Under Local Rule 7.1(b)(2)(B), reply briefs for dispositive motions are limited to ten (10) pages unless leave to file a brief in excess of the page limit is obtained from the Court. Denbury's reply brief is eighteen (18) pages, and Denbury did not obtain leave to file an over-length brief. Accordingly, the Court will not consider any arguments in Denbury's reply brief beyond page ten. In reply to the Christensens' arguments about its Fourth and Fifth Claims for Relief, Denbury asserts that it had no duty to amend the SDA because use of the words "can be" and "may" in the SDA indicate that all amendments to the SDA are permissive or optional but not required. Next, Denbury argues that the SDA does not require it to make the same payments expressed in the agreement for new surface use. Finally, Denbury argues that the SDA does not include the surface overlying minerals committed to the HDU; and therefore, the SDA cannot supersede applicable federal and state law.

On November 14, 2014, the Christensens moved the Court for leave to file an Amended Answer and Counterclaims. Doc. No. 28. The Court granted the motion and the Christensens filed their Amended Answer and Counterclaims. Doc. No. 42. In the Amended Answer and Counterclaims, the Christensens asserted a fourth counterclaim for breach of the implied covenant of good faith and fair dealing. *Id.* Denbury answered the amended counterclaims. Doc. No. 45.

On February 18, 2015, Denbury filed a *Motion for Summary Judgment on Christensens' Counterclaim IV (Breach of the Covenant of Good Faith and Fair Dealing) and Their Damages Counterclaims* and an accompanying memorandum of law. Docs. No. 51, 52. In its second motion for summary judgment, Denbury argued the following: (1) the SDA creates no duty to amend; and therefore, Denbury could not have breached the implied covenant of good faith and

fair dealing; (2) the Christensens admitted that no amendment under the SDA was required or expected; and therefore, Denbury could not have breached the implied covenant of good faith and fair dealing; (3) the course of conduct of the parties shows that no amendment to the SDA was required and further that no annual payments were required; (4) the Christensens failed to negotiate in good faith thereby legally excusing Denbury from any duty to amend the SDA; (5) Denbury made a good faith effort to negotiate and seek an amendment under the SDA; and (6) the Christensens' claims for damages are barred because they have received contractual payments for operations not subject to this litigation.

The Christensens argued the following in response to Denbury's second motion for summary judgment: (1) genuine issues of material fact exist as to whether Denbury breached the implied covenant of good faith and fair dealing; (2) Denbury has an obligation to deal with the Christensens in a manner that complies with the justified expectations and common purpose of the SDA which includes an obligation to seek to amend the SDA in good faith; (3) the Christensens have made no admission that an amendment was not expected or required; (4) genuine issues of material fact exist as to whether the parties' course of conduct shows that no amendment to the SDA and annual payments were required for later surface use; (5) genuine issues of material fact exist as to whether the Christensens failed to negotiate in good faith; (6) there are genuine issues of material fact as to whether Denbury negotiated in good faith; and (7) Denbury's argument that the Christensens' damage claims are barred lacks a legal and factual basis.

Thereafter, Denbury filed a *Motion to Strike Affidavit and Exhibits*. Doc. No. 65. Denbury argued that the affidavit of Mr. Christensen attached to the Christensens' opposition to Denbury's second motion for summary judgment should be stricken as a "sham affidavit." The

11

Christensens responded that Mr. Christensen's affidavit was submitted to reflect his understanding of a question in his deposition. Oral argument regarding both of Denbury's motions for summary judgment was held on April 3, 2015.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn" in the non-movant's favor. *Anderson*, 477 U.S. at 255.

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith*

12

*Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine dispute of material fact for trial. *See Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

When considering a motion for summary judgment, the court's role is not to weigh the evidence and decide the truth of the matter, but rather to determine whether a genuine dispute of material fact exists for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact-finder, not the court. *Id.* at 255.

## DISCUSSION

**I. Denbury's *Motion for Summary Judgment on its Third, Fourth and Fifth Claims for Relief Against the Christensen Defendants***

**A. Declaratory Judgment – Fourth and Fifth Claims for Relief**

**1. Denbury's Fifth Claim for Relief – "Declaratory judgment that Denbury is entitled to use all Christensen Ranch Surface overlying minerals in the Unit area."**

As an initial matter, this Court must consider whether there is a case of actual controversy within its jurisdiction regarding Denbury's use of the entire Christensen Ranch overlying minerals within the HDU. In *MedImmune, Inc. v. Genetech, Inc.*, the Supreme Court explained the distinction between a permissible declaratory judgment and an impermissible advisory opinion:

> The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). There was a time when this Court harbored doubts about the compatibility of declaratory-judgment

actions with Article III's case-or-controversy requirement. *See Willing v. Chicago Auditorium Assn.*, 277 U.S. 274, 289, 48 S.Ct. 507, 72 L.Ed. 880 (1928); *Liberty Warehouse Co. v. Grannis*, 273 U.S. 70, 47 S.Ct. 282, 71 L.Ed. 541 (1927); *see also Gordon v. United States*, 117 U.S. Appx. 697, 702 (1864) (the last opinion of Taney, C. J., published posthumously) ("The award of execution is . . . an essential part of every judgment passed by a court exercising judicial power"). We dispelled those doubts, however, in *Nashville, C. & St. L.R. Co. v. Wallace*, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933), holding (in a case involving a declaratory judgment rendered in state court) that an appropriate action for declaratory relief can be a case or controversy under Article III. The federal Declaratory Judgment Act was signed into law the following year, and we upheld its constitutionality in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Our opinion explained that the phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *Id.*, at 240, 57 S.Ct. 461.

*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not. Our decisions have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.*, at 240–241, 57 S.Ct. 461. In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), we summarized as follows: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

549 U.S. 118, 126–27 (2007).

When analyzing whether a district court has jurisdiction to grant a declaratory judgment, "[t]he question comes down to whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Columbian Financial Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011). The Tenth Circuit has explained that the facts as alleged must "mature before declaratory-judgment jurisdiction arises." *Id.* at 1378. Furthermore, "even if all the relevant facts regarding a particular legal issue are

known or knowable, a court does not have jurisdiction to resolve the issue unless that issue arises in a specific dispute having real-world consequences." *Id.* at 1379.

In its first motion for summary judgment, Denbury asked the Court to "[d]eclare that Denbury is entitled to use all surface of the Christensen [Ranch] located within the Unit, no matter who owns the minerals underlying the Christensen [Ranch]." Doc. No. 18. The facts as alleged in this case do not show that there is a substantial controversy between Denbury and the Christensens regarding use of the entire Christensen Ranch within the HDU. Instead, the facts alleged only concern a controversy over the construction and use of the New Road in Section 3. Substantial portions of the Christensen Ranch overlie private, state, and federal mineral interests, but the portion of the surface actually at issue only overlies federal mineral interest. Any dispute regarding entry onto surface lands overlying state or private mineral interests within the HDU are governed by the Unit Agreement and the Wyoming Split Estate Act ("WSEA"). *See* Doc. No. 18-1; Wyo. Stat. Ann. § 30-5-402 ("Any oil and gas operator having the right to any oil or gas underlying the surface of land may locate and enter the land for all purposes reasonable and necessary to conduct oil and gas operations to remove the oil or gas underlying the surface of that land."). On the other hand, as discussed more fully below, disputes regarding entry onto surface lands overlying federal mineral interests are governed by the Unit Agreement and federal law. *See* Doc. No. 18-1; 43 U.S.C. § 299(a) ("Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals . . . .").

The Unit Agreement, the WSEA, and the SRHA all require some degree of reasonableness before entry onto privately owned surface lands can occur. Under the Unit

Agreement, "the Unit Operator [has] the right to use as much of the surface of the land within the Unit Area as may be *reasonably necessary* for the operation and the development of the Unit Area." Doc. No. 18–1, p. 13 (emphasis added). Under the Wyoming Split Estate Act, "[a]ny oil and gas operator having the right to any oil or gas underlying the surface of land may locate and enter the land for all purposes *reasonable and necessary* to conduct oil and gas operations to remove the oil or gas underlying the surface of that land". Wyo. Stat. Ann. § 30-5-402(a) (emphasis added). Finally, under the SRHA, "[a]ny person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes *reasonably incident* to the mining or removal of the coal or other minerals . . . ." 42 U.S.C. § 299(a) (emphasis added).

No facts have been alleged regarding Denbury's entry onto the surface lands of the Christensens overlying state or private mineral interests. As a result, it would be impossible for the Court to declare that Denbury's proposed use is reasonable. This impossibility highlights the fact that Denbury's request for declaratory judgment that it is entitled to use the entire Christensen Ranch amounts to an opinion advising what the law would be upon a hypothetical state of facts. A declaration of rights in this case would not provide complete relief to either party in the event of a future attempt to use the surface of the Christensen Ranch because each future use would have to satisfy some degree of reasonableness. The Court finds that Denbury's request for a declaratory judgment that it is entitled to use the entire Christensen Ranch does not present an actual case or controversy within this Court's jurisdiction. Accordingly, the Court must dismiss Denbury's broad request for lack of jurisdiction.

**2. Denbury's Fourth Claim for Relief – "Declaratory judgment that Denbury is entitled to use all contiguous Christensen Ranch Surface overlying federal minerals."**

Next the Court must consider Denbury's request for a declaration "that Denbury is entitled to use all contiguous surface of the Christensen [Ranch] that overlies Federal minerals in the Unit." Doc. No. 18, p. 8. Denbury's broad request for relief regarding the entire Christensen Ranch as it overlies federal minerals suffers from the same problem as its Fifth Claim for Relief. The facts alleged in this case do not show that entry onto the entire Christensen Ranch is at issue. Rather, the question is, as Denbury argued in its motion for summary judgment, whether Denbury "has the right to immediately construct and use the New Road in Section 3." *Id.* at 12. This narrower request for relief presents a case of actual controversy within this Court's jurisdiction. In its first motion for summary judgment, Denbury argues that it has complied with both federal and state law for entry onto the Christensen Ranch overlying federal mineral interests within the HDU; and therefore, is entitled to immediately construct and use the New Road. For the purposes of this Order, the Court will separate Denbury's federal and state arguments.

**a. Stock-Raising Homestead Act**

The issue this Court must consider is whether Denbury has complied with the SRHA. In its first motion for summary judgment, Denbury acknowledges that it must comply with the SRHA and contends that it has done so. Denbury argues "[b]oth the reservation in the Warranty Deeds for access across the Lands to develop the Christensen fee minerals and the joinder of the Parents and Christensens as parties to the Unit Agreement constitute the Christensens' written

17

consent that Denbury may 'reenter and occupy' Section 3 to construct and use the New Road."[2]

Doc. No. 18. The Christensens take issue with Denbury's characterization of the Unit Agreement. First, the Christensens argue that the Unit Agreement only bound them with regard to their private mineral interests. Second, the Christensens argue that the Unit Agreement cannot constitute written consent to use of the surface over mineral interests they do not own. Finally, the Christensens argue that the SDA is evidence that the Unit Agreement does not constitute their written consent.

In pertinent part, the SRHA provides the following:

> Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals, first, upon securing the written consent or waiver of the homestead entryman or patentee; second, upon payment of the damages to crops or other tangible improvements to the owner thereof, where agreement may be had as to the

---

[2] Curiously, Denbury does not rely on the Unit Agreement as satisfying the written consent provision of the WSEA. *See* Wyo. Stat. Ann. § 30-5-402(c)(i) ("Entry upon the land for oil and gas operation shall be conditioned on the oil and gas operator providing the required notice, attempting good faith negotiations and . . . Securing the written consent or waiver of the surface owner for entry onto the land for oil and gas operations . . . ."). Instead, Denbury argues it has complied with the WSEA by posting a $5,000 bond with the WOGCC. *See* Wyo. Stat. Ann. § 30-5-402 (c)(iv) ("Entry upon the land for oil and gas operation shall be conditioned on the oil and gas operator providing the required notice, attempting good faith negotiations and . . . In lieu of complying with paragraph (i) or (ii) of this subsection, executing a good and sufficient surety bond or other guaranty to the commission for the use and benefit of the surface owner to secure payment of damages.").

amount thereof; or, third, in lieu of either of the foregoing provisions, upon the execution of a good and sufficient bond or undertaking to the United States for the use and benefit of the entryman or owner of the land, to secure the payment of such damages to the crops or tangible improvements of the entryman or owner . . .

43 U.S.C. § 299(a) (2012). In *Entek*, the Tenth Circuit recognized that the SRHA applies to unitized areas. 763 F.3d at 1255–56. The Tenth Circuit also stated the following: "The agreement's designated operator may . . . use any portion of the surface in the unit to aid its mining activities in the unit without respect to individual lease or surface boundaries. Put differently, the operator may . . . 'reenter and occupy' so much of the surface in the unitized area as may be 'reasonably incident' to extracting minerals from the unit." 763 F.3d 1252, 1256 (10th Cir. 2014). Importantly, the Tenth Circuit limited this rule in an attached footnote: "Of course, the [SRHA] requires that a mineral lessee seeking to *exercise* its right to 'reenter and occupy' must obtain the surface owner's agreement or post with the federal government a bond of a 'good and sufficient' amount. . . . We do not mean to suggest that unitization eliminates this statutory requirement." *Id.* at 1256 n.1 (citing 43 U.S.C. § 299(a)) (emphasis added).

The question then becomes whether the Unit Agreement constitutes the Christensens' written consent for purposes of § 299(a) of the SRHA. Under Wyoming law, "[t]he ultimate goal when interpreting a contract 'is to discern the intention of the parties to the document.'" *Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LCC*, 2008 WY 69, ¶ 6, 185 P.3d 1259, 1261 (Wyo. 2008) (quoting *Mullinnix, LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 22, 126 P.3d 909, 919 (Wyo. 2006)). To do so, the court "must look to the specific terms of the contract and give them their plain and ordinary meaning." *Id.* "Plain meaning is that meaning which the language would convey to reasonable persons at the time and place of its use." *Id.* (quoting *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 516, 524 (Wyo. 1993)) (internal quotation marks omitted).

Denbury asserts that the following language of the Unit Agreement constitutes the Christensens' written consent for purposes of § 299(a):

> 10. RIGHTS AND OBLIGATIONS OF UNIT OPERATOR. Except as otherwise specifically provided herein, the exclusive right, privilege, and duty of exercising any and all rights of the parties hereto, including surface rights, which are necessary or convenient for prospecting for, producing, storing, allocating, and distributing the Unitized Substances are hereby delegated to and shall be exercised by the Unit Operator as herein provided.
>
> * * *
>
> 11. PLAN OF OPERATION. . . . [T]he parties hereto, to the extent of their rights and interests, hereby grant to the Unit Operator the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for the operation and the development of the Unit Area hereunder.

Doc. No. 18-1.

It is clear from the Unit Agreement that the parties granted Denbury the right to reenter and occupy so much of the surface of the HDU as may be reasonably necessary to extracting minerals from the unit—"the parties hereto, to the extent of their rights and interests, hereby grant to the Unit Operator the right to use as much of the surface of the land within the Unit Area as may be reasonably necessary for the operation and the development of the Unit Area hereunder." Doc. No. 18-1, p. 16; *see also Entek*, 763 F.3d at 1256 ("the operator may . . . 'reenter and occupy' so much of the surface in the unitized area as may be 'reasonably incident' to extracting minerals from the unit"). However, as the Tenth Circuit recognized in *Entek*, "the [SRHA] requires that a mineral lessee seeking to *exercise* its right to 'reenter and occupy' must obtain the surface owner's agreement or post with the federal government a bond of a 'good and sufficient' amount." *Id.* at 1256 n.1 (citing 43 U.S.C. § 299(a)) (emphasis added). The clear language of the Unit Agreement does not evidence written consent on the part of the Christensens.

Furthermore, the Court must consider the subsequent SDA. *See Belden v. Thorkildsen*, 156 P.3d 320, 324–25 (Wyo. 2007) ("[T]he parol evidence rule 'does not affect a purely collateral contract distinct from, and independent of, the written agreement, even though it relates to the same general subject matter and grows out of the same transaction, if it is not inconsistent with the writing.'" (quoting *Western Nat'l Bank of Lovell v. Moncur*, 624 P.2d 765, 770–71 (Wyo. 1981)). Three years after Cities Service, Denbury's predecessor in interest, and the Christensens joined the Unit Agreement, they both entered into the SDA. Doc. No. 18-1, p. 51. If the intent of Cities Service and the Christensens was for paragraphs 10 and 11 of the Unit Agreement to constitute written consent for purposes § 299(a), it begs the question why they would later enter into a surface access agreement. The only reasonable and rational reading of paragraphs 10 and 11 and the SDA is that the Unit Agreement gave the Unit Operator the right to reenter and occupy the surface of the Christensen Ranch within the HDU and the SDA satisfied the conditions precedent to exercising that right. The Court finds that paragraphs 10 and 11 of the Unit Agreement do not constitute the Christensens' written consent for purposes of § 299(a) of the SRHA. The Court further finds that Denbury has not satisfied its obligations under federal law; and therefore, Denbury is not entitled to immediately construct and use the New Road in Section 3.

### b. Wyoming Split Estate Act

The next issue this Court must consider is whether Denbury is entitled to judgment as a matter of law that it has complied with the WSEA. The question of whether Denbury has complied with the WSEA necessarily raises the issue of whether Denbury must. In its first motion for summary judgment, Denbury noted that "it has not been legally decided that Denbury is also required to comply with the Wyoming Split Estate Act." Doc. No. 18. In other words, it

has not been decided if the WSEA is preempted by the SRHA. Cox, Randall T., *Analysis of the Wyoming Split Estate Act*, W.S. 30-5-401, et seq., 37 Wyo. Law. 1 (Feb. 2014) ("No oil and gas operator has been brave enough to take on this challenge."); Rebecca W. Watson, *State Surface Owner Protection Laws: Tales of Preemption, Federalism, and a Changing West*, 2008 No. 1 RMMLF-INST Paper No. 13A (2008) ("To date, no one has challenged the application of the Wyoming Act."). At oral argument, counsel for Denbury noted that they did not want to litigate the issue of preemption to avoid the expense and delay of making such arguments.

Without arguments related to the issue of preemption, it would be improper for this Court to decide that issue. Although it seems likely that the WSEA would be preempted by the SRHA, this Court will proceed under the theory, as assumed by the parties, that the WSEA is not preempted. *See* Jennifer A.C. Richardson, *Protecting Surface Land by Internalizing the Costs of Oil and Gas Development: Wyoming's Surface Owner Accommodation Act Strikes a More Sustainable Balance*, 38 Hastings Const. L.Q. 697, 699 (2011) ("The remainder of this paper compares the state and federal statutes and regulations, and determines that because compliance with both laws is possible and the [WSEA] does not frustrate federal purposes, the regulations do not operationally conflict."); Watson, *supra* ("Field preemption does not appear to apply in the context of state surface owner protection laws because the regulation of the impacts of mineral development has a long history of being a joint effort between the federal government and state governments."). *But see* Matt Micheli, *Showdown at the Ok Corral-Wyoming's Challenge to U.S. Supremacy on Federal Split Estate Lands*, 6 Wyo. L. Rev. 31, 46 (2006) ("As the WOGCC moves forward with specific application of its rules, any rule or application of a rule that conflicts with the full purpose and objectives of federal law will be preempted."), Cox, *supra* ("The [WSEA] does not (should not) apply to federal minerals because the act is inconsistent

with federal law and imposes inconsistent obligations on operators developing federal minerals. This act is preempted by the Stock Raising Homestead Act, the Mineral Leasing Act, and other federal rules and orders."); Norman D. Ewart, *State Surface Access and Compensation Statutes*, 54 FMMLF-INST 4-1, § 4.04[3] (2008) ("It is the opinion of this author that the BLM has comprehensively regulated the area of surface access for split estates involving federal . . . minerals.").

In pertinent part, the WSEA provides the following: "Any oil and gas operator having the right to any oil or gas underlying the surface of land may locate and enter the land for all purposes *reasonable and necessary* to conduct oil and gas operations to remove the oil or gas underlying the surface of that land." Wyo. Stat. Ann. § 30-5-402(a) (emphasis added). Denbury argues that the New Road is reasonable and necessary to its operations. On the other hand, the Christensens argue that the New Road is not reasonable and necessary. As the question of whether the New Road is reasonable and necessary could be resolved in favor of either side by a reasonable juror and the resolution of that question is essential the proper disposition of Denbury's claim, the Court finds there is a genuine dispute as to a material fact. Accordingly, the Court finds that Denbury is not entitled to judgment as a matter of law.

Of course, if the New Road is reasonable and necessary, Denbury must still comply with the other requirements of the WSEA. For example, § 30-5-402(c) provides that "[e]ntry upon the land for oil and gas operations shall be conditioned on the oil and gas operator providing the required notice, attempting good faith negotiations and: . . . executing a good and sufficient surety bond or other guaranty to the commission . . . ." Wyo. Stat. Ann. § 30-5-402(c). Denbury alleges that it has posted the required bond with the WOGCC and the Christensens do not dispute that fact. However, the Christensens do argue that Denbury failed to attempt good faith

negotiations. That argument is not directly addressed by Denbury's second motion for summary judgment. The question of whether Denbury attempted good faith negotiations also presents a genuine dispute as to a material fact.

There is another problem inherent in Denbury's request for declaratory judgment. Even if the jury finds that the New Road is reasonable and necessary to Denbury's operations, and that Denbury attempted good faith negotiations, Denbury would still not be able to immediately access Section 3 to construct and use the New Road. As explained above, Denbury has not yet complied with the SRHA. Accordingly, even if the jury finds in favor of Denbury on the issue of the WSEA, Denbury could not construct and use the New Road until it has complied with the requirements of the SRHA.

## B. Permanent Injunction – Third Claim for Relief

Next, this Court must consider whether Denbury is entitled to a permanent injunction as a matter of law to prevent the Christensens from interfering with Denbury's construction and use of the New Road. A district court may only issue a permanent injunction when the remedy at law is inadequate to compensate a party for the injury sustained. *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1353 (10th Cir. 1989). In order to obtain a permanent injunction, the party seeking the injunction has the burden of demonstrating: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007)) (internal quotation marks omitted). As explained above, Denbury cannot prove actual success on the merits at this time.

24

Accordingly, it would be improper for this Court to grant Denbury a permanent injunction to prevent the Christensens from interfering with the construction and use of the New Road in Section 3 at this stage in the proceedings.

## II. Denbury's *Motion for Summary Judgment on Christensen's Counterclaim IV (Breach of the Covenant of Good Faith and Fair Dealing) and Their Damages Counterclaims*

### A. Counterclaim for Breach of the Covenant of Good Faith and Fair Dealing

The next issue the Court must consider is whether Denbury is entitled to judgment as a matter of law on the Christensens' counterclaim for breach of the implied covenant of good faith and fair dealing. The Wyoming Supreme Court recognizes that the implied covenant of good faith and fair dealing applies to commercial contracts. *Ultra Resources, Inc. v. Hartman*, 2010 WY 36, ¶ 84, 226 P.3d 889, 919 (Wyo. 2010). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205 (1981). The Wyoming Supreme Court interprets the implied covenant of good faith and fair dealing to require "that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement." *Ultra Resources*, 2010 WY 36, ¶ 84, 226 P.3d at 919 (quoting *City of Gillette v. Hladky Constr., Inc.*, 2008 WY 134, ¶ 30, 196 P.3d 184, 196 (Wyo. 2008)). Furthermore,

> the implied covenant of good faith and fair dealing requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. The purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness and reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

*Id.* at ¶ 85, 920 (quoting *Whitlock Constr., Inc. v. South Big Horn County Water Supply Joint Powers Bd.*, 2002 WY 36, ¶ 24, 41 P.3d 1261, 1267 (Wyo. 2002)) (internal quotation marks omitted). The resolution of a claim for breach of the implied covenant of good faith and fair dealing will generally require a factual inquiry. *Id.* However, "a party is entitled to a judgment as a matter of law 'if, under the facts in the record, the party's actions alleged as a basis for the breach of the implied covenant were in conformity with the clear language of the contract.'" *Id.* (quoting *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 19 n.2, 18 P.3d 645, 654 n.2 (Wyo. 2001)).

Denbury first argues the SDA creates no duty to amend; and therefore, Denbury could not have breached the implied covenant of good faith and fair dealing. In making this argument, Denbury relies on the following language from the SDA:

> It is agreed that this Agreement *can be amended* so as to add rights-of-way, easements and site payments by the revision of Exhibit "A" and Exhibit "B" *to the mutual satisfaction of Owners and Operator*."
>
> * * *
>
> Exhibits "A" and "B" *may be amended* by adding to or deleting roads or sites covered under their Agreement by written approval *of both the Owners and Operator*.

Doc. No. 51 (quoting Doc. No. 18-1). In response, the Christensens assert that the purpose of the SDA is to grant Denbury use of the Christensens' surface lands for production operations subject to the appropriate compensation being paid, which under the agreement includes annual payments, for only those operations identified in the SDA. For future operations, the Christensens assert, the SDA provided a mechanism to ensure the parties to the agreement would continue to honor the purpose and expectations of the SDA by including a provision that the

SDA could be amended to add rights-of-way, easements, and site payments by the revision of the identified wells, roads, and sites to the mutual satisfaction of the parties.

Second, Denbury argues the Christensens admitted that no amendment under the SDA was required or expected; and therefore, Denbury could not have breached the implied covenant of good faith and fair dealing. Denbury points to the following portion of Mr. Christensen's deposition:

> Q: (By Mr. Belcher) Is it your position that Denbury cannot conduct operations in the Hartzog Draw Unit for new operations without amending the 1983 surface damages agreement with City Service?
>
> Mr. Klosterman: Object to the form.
>
> A: I guess I'm not totally understanding what you're asking me there. That's pretty broad. They cannot do operations – you're asking me if I'm saying they can't do operations –
>
> Q: (By Mr. Belcher) That's correct.
>
> A: -- without amending this contract?
>
> Q: Yes, that's my question.
>
> A: I guess I never thought about it. I don't know. There probably are some amendments that could be done from both sides, but it hasn't been. It's been -- for 30-some years every other agreement or every other operator's operated, and I didn't see there was any need to amend it.

Doc. No. 51-13, p. 3–4. From this, Denbury argues that the parties could mutually agree to amend the SDA but no amendment is required as a condition to Denbury's use of the Christensen Ranch for HDU operations. In response, the Christensens argue that Mr. Christensen perceived the question differently. Mr. Christensen's understanding of the question, it is argued, was whether the stated damage amounts in the SDA needed to be amended. Mr. Christensen submitted an affidavit in support of this position. *See* Doc. No. 62-2. Mr. Christensen's affidavit is the target of Denbury's *Motion to Strike Affidavit and Exhibits* (Doc. No. 65).

In its motion, Denbury argued that Mr. Christensen's affidavit is defective and should not be considered by this Court. In particular, Denbury argued that Mr. Christensen's affidavit is a sham affidavit because it contradicts his prior deposition testimony. Denbury also challenges Mr. Christensen's affidavit on the grounds that it seeks to rely on and introduce exhibits that the Christensens failed to provide previously. In response, the Christensens argue that Mr. Christensen's affidavit is not a sham affidavit because it was submitted to clear up his confusion regarding the question in his deposition. Moreover, the separate agreement attached to his affidavit, the Christensens assert, did not prejudice Denbury because Denbury was a party to that separate agreement. Finally, the Christensens argue that Mr. Christensen's affidavit reflects his personal knowledge of an agreement in principal and is not hearsay.

As the Tenth Circuit has explained, "in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). "In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* The factors a court must consider in determining whether an affidavit presents a sham issue "include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* In the line of questioning, on which Denbury seeks to rely regarding Mr. Christensen's alleged waiver of amending the SDA, Mr. Christensen stated "I guess I'm not totally understanding what you're asking me there." Doc. No. 51-13. It is clear there was

confusion, and the affidavit attempts to resolve that confusion. Accordingly, the Court finds that Mr. Christensen's affidavit should not be stricken on the grounds of creating a sham issue.

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that if a party fails to provide information required by Rule 26(a) or 26(f), the party is not allowed to use that information to support a motion, at a hearing, or a trial unless the failure was substantially justified or harmless. Fed. R. Civ. Pro. 37(c)(1). The question of whether a Rule 26(a) violation is justified or harmless is left to the broad discretion of the district court. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quoting *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)). "[T]he following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

Denbury seeks to strike Mr. Christensen's affidavit because it relied on an agreement between Mr. Robert Innes and Denbury that was not disclosed under Rule 26(a). It is difficult to see how an agreement entered into between Mr. Innes and Denbury could surprise or prejudice Denbury. *See* Doc. No. 62-2, p. 32. Denbury argues that by not disclosing the document as part of the Rule 26(a) disclosures, Denbury has been placed at a disadvantage in preparing the case. Presumably, this is based on the belief that Denbury did not know the agreement would be relevant to this case. To the extent it prejudiced Denbury's preparation of the case, Denbury has been aware of the relevance of the agreement since Mr. Christensen's affidavit was submitted on March 9, 2015, two months before trial, and any prejudice caused to Denbury's preparation has

been cured by the passage of time. Accordingly, the Court will not strike Mr. Christensen's affidavit because it relied on an agreement to which Denbury was a party.

Denbury further argues Mr. Christensen's affidavit should be stricken because it attempts to use evidence that is both speculative and based on hearsay. 477 U.S. 317, 324 (1986). "Parties may, submit affidavits . . . in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005)). However, "the content or substance of the evidence must be admissible." *Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)). "[A]t summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form." *Id.* (citing *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999)). Moreover, affidavits that contain speculation and statements in an affidavit prefaced by phrases such as "I believe" or "upon information and belief" are properly subject to a motion to strike. *Aludo v. Denver Area Council*, 2008 WL 2782734 (D. Colo. July 8, 2008) (citing *Tavery v. United States*, 32 F.3d 1423, 1426 n.4 (10th Cir. 1994)).

Denbury argues that Mr. Christensen's following statement is hearsay and should be stricken: "I am also aware that some companies are providing $3,000 per disturbed acre and $12.00 per rod for use of surface lands just adjacent to the Hartzog Draw Unit." Doc. No. 62–2, p. 2. Rule 801 provides that "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Court finds that this sentence

is hearsay within the meaning of Rule 801 and does not fall within any exception. Accordingly, the sentence of Mr. Christensen's affidavit which reads "I am also aware that some companies are providing $3,000 per disturbed acre and $12.00 per rod for use of surface lands just adjacent to the Hartzog Draw Unit" should be stricken. Denbury further argues that the sentence which states "At this time, I expect this agreement to be finalized based on these numbers" should be stricken as speculative. The Court agrees that Mr. Christensen's testimony in this regard is speculative. Accordingly, this sentence of Mr. Christensen's affidavit should also be stricken.

Returning to the question of breach of the implied covenant of good faith and fair dealing, the Court must first examine the language of the SDA. The SDA appears to apply to operations occurring on the surface at issue in this case, "[t]hat Operator conducts oil and gas production operations on Owner's property situated in Campbell & Johnson Counties State of Wyoming, to wit: . . . Section[] . . . 3 . . . in T45N, R75W." Doc. No. 18-1, p. 51. Next, the SDA provides "[t]hat in order for Operator to enter and conduct production operations, it is necessary that they cross and use certain property of owners, and the parties hereby agree as to the entry and surface use thereof." *Id.* The SDA also provides that "Owners hereby give, grant and convey unto Operator, its agents, employees and assigns, a right-of-way-easement to enter upon and use the property of Owners for the purpose of conducting production operations of the below described wells and facilities under the lease or leases." *Id.* Entry, however, is also constrained by the SDA: "All surface and mineral use not inconsistent with the rights of Operator, including the right to grant successive easements thereon or across, are hereby reserved to Owner and consideration shall always be given to such reserved uses and rights when locating sites, roads, pipelines and facilities." *Id.* at 52.

As explained above, "[t]he question of whether the implied covenant of good faith and fair dealing was breached is ordinarily one of fact, focusing on the conduct alleged as constituting the breach within the context of the contract language, the parties' course of conduct and industry standards." *Hladky*, 2008 WY 134, ¶ 32, 196 P.3d at 196–97. As a result, "[a] party is entitled to judgment as a matter of law on the claim [for breach of the implied covenant of good faith and fair dealing] only where the actions alleged to have breached the covenant were in conformity with the clear contract language." *Id.* Denbury argues that it did not breach the covenant of good faith and fair dealing because its actions were in conformity with the language of the SDA. The Christensens argue that Denbury's actions were not inconformity with the language of the SDA. The Court finds that the evidence establishes a material dispute as to whether Denbury's alleged conduct "went beyond the exercise of contract rights and amounted to self-dealing or a violation of community standards of decency, fairness or reasonableness." *Hladky*, 2008 WY 134, ¶ 32, 196 P.3d at 197. The dispute is genuine because a reasonable juror could resolve the question in favor of either side. Moreover, the dispute is material because under the substantive law, resolution of the dispute is essential to the proper disposition of the counterclaim. Accordingly, Denbury is not entitled to judgment as a matter of law on the Christensen's counterclaim for breach of the implied covenant of good faith and fair dealing.

## B. Denbury's Claim for Breach of the Covenant of Good Faith and Fair Dealing

In its second motion for summary judgment, Denbury asserted for the first time that if the SDA creates a duty of good faith and fair dealing, then the Christensens have likewise breached that duty. During oral argument, Denbury moved to amend to add the new claim for breach of the covenant of good faith and fair dealing. As the Tenth Circuit Court of Appeals explained, "An issue raised for the first time in a motion for summary judgment may properly be considered

a request to amend the complaint, pursuant to Federal Rule of Civil Procedure 15." *Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir. 2011) (citing *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n. 9 (10th Cir. 1998)). Rule 15 mandates that the Court should freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). However, "[t]he liberalized pleading rules do not allow plaintiffs 'to wait until the last minute to ascertain and refine the theories on which they intend to build their case.'" *Pater*, 646 F.3d at 1299 (quoting *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir.1991)). When the party seeking to amend by asserting a new claim in a motion for summary judgment has no adequate explanation for the delay, "untimeliness alone is a sufficient reason to deny leave." *Id.* (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365–66 (10th Cir. 1993)) (internal quotation marks omitted). In its second motion for summary judgment and during oral argument, counsel for Denbury provided no explanation for the delay in raising its new claim. Accordingly, the Court will not grant Denbury leave to amend to add a new claim for breach of the covenant of good faith and fair dealing at this point in the proceedings.

## C. Denbury's Damages Off-Set Argument

The last question this Court must address is whether the Christensens' claim for damages is barred because they have already been paid more than the highest amount of damages their expert has calculated. Denbury argues the Christensen's expert witness's damages calculation is "a maximum damages claim of $400/acre for the entire 33,253 acre Christensen ranch, which maximum totals $13,301,200." Doc. No. 52. Denbury then points out that "[t]he Christensens have already been paid $13,673,158.82 for surface damages for only the half of the ranch included within the Hartzog Draw Unit area. That amount exceeds the maximum damages their expert claims for the entire ranch and exceeds the value [of] the entire ranch . . . ." *Id.* Thus,

Denbury argues, "[t]he Christensens have been paid more than their ranch is worth and more than the maximum damages their expert calculates is recoverable. Consequently, their claims for damages should be dismissed." *Id.* In response, the Christensens assert that Denbury's argument in this regard lacks a legal or factual basis. In particular, the Christensens state the following: "To suggest that because the Christensens have received contractually agreed upon payments this eliminates Denbury's obligations is simply absurd." Doc. No. 62.

To support its argument, Denbury relies on four cases: *Dubrowski v. Wyoming Liquor Commission*, 1 P.3d 631, 634 (Wyo. 2000); *Day v. Davidson*, 951 P.2d 378, 383 (Wyo. 1997); *U.S. v. Winter Lvstk. Comm.*, 924 F.2d 986, 993 (10th Cir. 1991); and *Painter & Co. v. Stahley Bros.*, 90 P. 375, 376–77 (Wyo. 1907). None of the cases cited by Denbury directly support its position. The Christensens asserted counterclaims for breach of the covenant of good faith and fair dealing and trespass. Both of those counterclaims include damages. Damages for a breach of the covenant of good faith and fair dealing are compensatory. *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 134, 196 P.3d 184, 201 (Wyo. 2008) ("Wyoming has recognized that a breach of the implied covenant of good faith and fair dealing may be actionable in contract for compensatory damages."). Damages for trespass include either nominal or actual damages. *Bellis v. Kersey*, 241 P.3d 818, 825 (Wyo. 2010).

In its second motion for summary judgment, Denbury provides no explanation for why the alleged damages suffered as a result of the alleged breach of the covenant of good faith and fair dealing or the alleged trespass should be off-set by other contractual payments made to the Christensens. The Court finds Denbury's argument unavailing. There are genuine disputes of material fact as to the amount of damages the Christensens suffered. Accordingly, the Court

finds that Denbury is not entitled to judgment as a matter of law on the Christensens' damages claims.

**CONCLUSION**

In its first motion for summary judgment, Denbury made two interrelated requests: "(1) Declare that is entitled to use all contiguous surface of the Christensen [Ranch] that overlies Federal minerals in the Unit"; and (2) "Declare that Denbury is entitled to use all surface of the Christensen [Ranch] located within the Unit, no matter who owns the minerals underlying the Christensen [Ranch]." Doc. No. 18. At this point in time, there remains only one dispute between Denbury and the Christensens—the construction and use of a one-quarter mile road located in Section 3 overlying federal mineral interests. Pursuant to the Declaratory Judgment Act, a district court may only grant a declaratory judgment if there is "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). The facts as alleged in this case do not present a case of actual controversy within this Court's jurisdiction as to entry onto the entire Christensen Ranch. Accordingly, Denbury's Fifth Claim for Relief for a declaratory judgment that it is entitled to use the entire Christensen Ranch overlying minerals in the HDU must be dismissed for lack of jurisdiction.

Denbury's Third and Fourth Claims for Relief are so interrelated that both claims must be discussed together. In its Fourth Claim for Relief, Denbury seeks a declaratory judgment that it is entitled to use all contiguous Christensen Ranch overlying federal mineral interests. In its Third Claim for Relief, Denbury seeks an injunction to prevent the Christensens from interfering with the construction and use of the New Road in Section 3. Pursuant to the Stock-Raising Homestead Act and the Unit Agreement, Denbury may reenter and occupy so much of the surface in the Hartzog Draw Unit as may be reasonably incident to extracting minerals from the

unit. However, before exercising that right, Denbury must satisfy the conditions precedent for reentering and occupying the surface of the Hartzog Draw Unit (1) by obtaining the surface owner's written consent, (2) by reaching a surface access agreement with the surface owner, or (3) if an agreement cannot be reached, by posting a bond of good and sufficient amount with the BLM. 43 U.S.C. § 299(a); Onshore Oil and Gas Operations; Federal and Indian Oil and Gas Leases; Onshore Oil and Gas Order Number 1, Approval of Operations, 72 FR 10308-01 ("Bonds are used in lieu of a Surface Access Agreement to assure surface owner compensation for damages as prescribed by the appropriate law. Bonds can only be used when the operator certifies that a Surface Access Agreement could not be reached and the BLM confirms that fact with the surface owner, if possible. Bonds are not required when a Surface Access Agreement has been made."). The Court finds that Denbury has not satisfied the conditions precedent for exercising its right to reenter and occupy the surface of Section 3 to construct and use the New Road. As a result, Denbury is not entitled to summary judgment as a matter of law on its Third and Fourth Claims for Relief.

This case arises at an unusual intersection of state and federal law. The issue of preemption is implicated, but neither party sought to argue for or against the application of the WSEA. Because the issue of preemption was not properly raised, this Court will not consider it. Assuming, as the parties do, that the WSEA governs the dispute at issue, there are genuine disputes of material fact as to whether the New Road is reasonable and necessary and whether Denbury attempted good faith negotiations. Accordingly, Denbury is not entitled to judgment as a matter of law that it has complied with the WSEA.

In its second motion, Denbury sought summary judgment on the Christensen's counterclaim for breach of the covenant of good faith and faith dealing, and the Christensen's

counterclaims for damages. The Court finds there are genuine disputes of material fact as to the Christensens' counterclaims; and as a result, granting summary judgment would be improper. Finally, in its motion to strike Mr. Christensen's affidavit, Denbury sought to strike Mr. Christensen's affidavit in its entirety. The Court disagrees with striking the affidavit in its entirety, but does find that certain portions should be stricken. Accordingly, it is therefore

**ORDERED** that Denbury's *Motion for Summary Judgment for Summary Judgment on its Third, Fourth and Fifth Claims for Relief Against the Christensen Defendants* (Doc. No. 17) shall be, and is, **DENIED. It is further**

**ORDERED** that Denbury's *Motion for Summary Judgment on Christensens' Counterclaim IV (Breach of the Covenant of Good Faith and Fair Dealing) and Their Damages Counterclaims* (Doc. No. 51) shall be, and is, **DENIED. It is further**

**ORDERED** that Denbury's *Motion to Strike Affidavit and Exhibits* (Doc. No. 65) is **GRANTED IN PART and DENIED IN PART** and that the portions of Mr. Christensen's affidavit identified in this Order shall be stricken.

Dated this 17th day of April 2015.

Alan B. Johnson
United States District Judge

37